Argued December 2, 1936; affirmed January 19; rehearing
denied February 9, 1937

## FEHL v. MARTIN ET AL.

(64 P. (2d) 631)

In Banc.

*Irvin Goodman,* of Portland, for appellant.

*Ralph E. Moody,* Assistant Attorney General (I. H.
Van Winkle, Attorney General, on the brief), for re-
spondents.

RAND, J. On August 15, 1933, Earl H. Fehl was
committed to the Oregon state penitentiary under an
indeterminate sentence of four years. Subsequently
and on May 29, 1936, after having served two years,
nine months and 14 days, he was paroled by the
governor under certa... conditions stated in the parole.
He now brings these proceedings, claiming that, under
section 13-1906, Oregon Code 1930, his term had expired
and he was entitled to a final discharge.

That section reads as follows:

"Any person sentenced to serve an indeterminate
sentence in the penitentiary may be paroled by the

governor upon his own motion, or upon the recommendation of the parole board, in accordance with the provisions of this section set forth, to wit:

"Any person under the age of twenty years at the time of conviction and sentence, who has not previously been convicted of a crime, may be paroled by the governor upon his own motion, or upon the recommendation of the parole board at any time after said person is committed to the penitentiary.

"Any person over the age of twenty years at the time of conviction and sentence who has not been previously convicted of a crime may be paroled by the governor upon his own motion, or upon recommendation of the parole board, at any time after such person has served one-half of the maximum term for which such person has been sentenced; provided, however, that a record of good conduct, industry and evidence of general reformation certified to by the warden of the penitentiary shall entitle such person to a deduction of five days for each month of said one-half of the maximum sentence, when said one-half of maximum sentence is one year or less, and a deduction of ten days for each month of such period beyond one year. The effect of this 'good time' deduction is intended to be as follows: When the one-half period of the maximum sentence is six months, a parole may be granted when five months have been served; when the one-half period is twelve months a parole may be granted when ten months have been served; when the one-half period is eighteen months, a parole may be granted when twelve months have been served; when the one-half period is two years a parole may be granted when sixteen months have been served, and so on proportionately for any term."

It seems obvious from a mere reading of the section, that that section was intended to apply to the granting of paroles and was not intended by the legislature, where no parole was granted, to shorten the term for which a prisoner had been sentenced. That the legislature had the power to provide that, because of the good

behavior of a prisoner in the penitentiary, his sentence should be shortened and to determine to what extent it should be shortened is not questioned. If such had been the intention of the legislature, it is reasonable to infer that the legislature would have said so in some plain and unmistakable manner without any reference to the granting of paroles and, if the act has the meaning now contended for by the plaintiff, it seems plain that it contains two subjects of legislation and not one subject and matters properly connected therewith, as is required by section 20 of Article IV of the state constitution, and, hence, is in violation thereof. That an act shortening the time of a sentence which has already been passed and an act authorizing the governor of the state to parole a prisoner while serving such sentence are two entirely distinct matters having no connection with each other is clear. One is not germane to the other, nor is there any proper connection between the two, and nothing is said in the title of the act or in the title to any of the amendatory acts in respect to the shortening of the terms of the sentences of prisoners in the penitentiary for good behavior or otherwise. That subject, therefore, is not expressed in the title of any of said acts.

While it is true that the legislative assembly may, by a general statute, fix the terms of imprisonment of persons convicted of crime and may also, by a general law applicable to all prisoners alike, shorten the term for which they have previously been sentenced because of their good behavior during confinement, yet the legislature, except in treason cases, is, under our constitution, wholly devoid of any pardoning power.

Section 14 of Article V of the state constitution provides:

"He [the governor] shall have power to grant reprieves, commutations, and pardons, after conviction,

for all offenses except treason, subject to such regulations as may be provided by law. Upon conviction for treason, he shall have power to suspend the execution of the sentence until the case shall be reported to the legislative assembly, at its next meeting, when the legislative assembly shall either grant a pardon, commute the sentence, direct the execution of the sentence, or grant a further reprieve. He shall have power to remit fines and forfeitures, under such regulations as may be prescribed by law; and shall report to the legislative assembly, at its next meeting, each case of reprieve, commutation, or pardon granted, and the reasons for granting the same; and also the names of all persons in whose favor remission of fines and forfeitures shall have been made, and the several amounts remitted.''

It will thus be seen from a mere reading of this provision of the constitution that the whole power to grant reprieves, commutations and pardons after conviction for all offenses except treason, subject to such regulations as may be provided by law, is committed to the governor. Under the statute above referred to the governor is vested with the exclusive authority to grant paroles. At the time our constitution was adopted, the granting of a parole to a person who had been convicted of a crime and was being imprisoned in the penitentiary was unknown to our law. The word ''parole'' at that time meant an agreement of persons who had been taken prisoners by an enemy that they will not again take up arms against those who captured them, either for a limited time or during the continuance of the war. See Bouvier's Law Dict. According to that author, statutes authorizing the granting of paroles were first passed in certain of the states in 1897, and such provisions were not adopted in this state for several years thereafter.

According to Bouvier, "reprieve" is the withdrawing of a sentence for an interval of time, which operates in delay of execution, 4 Bla Com. 394. And "commutation" is a change of punishment to which a person has been condemned to one less severe. A pardon, says Bouvier, may be absolute or conditional, an absolute pardon being one which frees the criminal without any condition whatever, while a conditional pardon is one to which a condition is annexed, performance of which is necessary to the validity of the pardon.

Our statute provides for conditions to be annexed to the granting of paroles. See section 13-1910, Oregon Code 1930. It is fair to assume from the provisions of our statutes, that a parole is a conditional pardon. If that is so, the constitutional power of pardoning vested in the governor is not subject to legislative control, either to limit the effect of a pardon or to exclude from its operation any class of offenders: *Ex parte Garland,* 4 Wall. 333 (18 L. Ed. 366). And, therefore, no act of the legislature could take away from the governor the power to grant an absolute or a conditional pardon at any time after sentence has been pronounced.

It has been argued that a prisoner in the Oregon penitentiary ought not to be deprived of the hope of having his term of imprisonment shortened by good behavior as would result from our holding that the statute applies to the granting of paroles only and has no application generally to the shortening of the terms of imprisonment in all cases where the prisoners' conduct during their confinement has been exemplary.

Every one will agree that good conduct, when actuated by good motives, is always commendable and should be encouraged even in the case of persons convicted of crime. A modicum of common sense, however, teaches every inmate of the penitentiary that good con-

duct upon his part during his term of confinement is not only the best but also the only sensible course for him to pursue and, hence, good conduct of a prisoner alone is not necessarily any evidence of his fitness for a parole. The warden and other officers of the penitentiary—who come into daily contact with the prisoner and have an opportunity to judge of his true character—are the best judges of whether his character is such that he should be paroled before the expiration of his term or be compelled to serve his full sentence. The law contemplates that these officers shall exercise judgment in determining whom they shall recommend to the governor for parole and who shall be compelled to serve their entire term. Hence, that argument, if it could have any weight in the construction of a statute, must, in this case, fail since the language of the statute itself shows that it was intended to apply to the time in which a parole may be granted by the governor and was to have no application to the shortening of any term where no parole was granted.

The numerous cases where the most dastardly crimes have been committed in this and other states by persons under parole or pardoned before the expiration of their terms shows the necessity of using great care and caution in the exercise of the pardoning power. In all such cases, it is not the liberty of the criminal but the safety of the public which should first be considered.

For the reasons stated, the decree of the lower court is affirmed.

BEAN, C. J., and ROSSMAN, J., concur.

BAILEY, J., specially concurs.

KELLY, J., dissents; BELT, J., concurring in dissent.

CAMPBELL, J., not sitting.

BAILEY, J. (specially concurring). Earl H. Fehl was, on or about August 7, 1933, found guilty of the crime of burglary not in a dwelling and on that date was sentenced to serve an indeterminate period of imprisonment in the Oregon state penitentiary for a term of not exceeding four years. Thereafter, on August 15, 1933, Fehl began to serve his sentence in the penitentiary and continued serving until May 29, 1936, when he accepted a conditional parole issued by the governor, dated April 16, 1936.

This suit was filed by Fehl as plaintiff on June 15, 1936, against the governor, members of the parole board, the parole officer and Ralph E. Moody, assistant attorney general, as defendants, to have declared null and void the "pretended parole" and to have the court declare that the plaintiff had served his maximum sentence in said penitentiary, less good time deductions, and that he should be unconditionally released therefrom by the warden. This appeal is prosecuted from a decree dismissing the suit, entered after the trial court sustained defendants' general demurrer to the complaint.

Plaintiff's initial pleading alleges in effect that during the course of Fehl's imprisonment his record had been one of good conduct and industry and had shown evidence of general reformation and that the warden of the penitentiary had issued a certificate as to his good behavior, pursuant to § 13-1906, Oregon Code 1930. It is plaintiff's contention that because of his record in the penitentiary, as above stated, he is entitled as a matter of right to a deduction of sixteen months from the maximum sentence of four years imposed upon him by the circuit court, and that he had fully served his sentence on April 15, 1936. In support of this argument

he relies principally upon § 13-1906, *supra,* which is a part of the act of 1905 (chapter 187, Laws 1905) as subsequently amended.

Before discussing that section of the code, it is well to review briefly the historical background of legislation affecting the subject before us. The title of chapter 187, *supra,* as far as material here, is as follows: ''An act to provide for sentencing certain persons convicted of felonies to imprisonment for indeterminate periods, and to provide for the parole of such persons by the governor, and for the keeping of records of such cases, and for the revocation of such paroles.''

It is by this act (chapter 187, Laws 1905, *supra*) provided that when any one is convicted of a felony for which the maximum penalty does not exceed twenty years' imprisonment, the court may, in its discretion, sentence such person to imprisonment in the penitentiary without limitation of time, and any person so convicted and sentenced may be paroled for good conduct, by the governor, upon such terms and conditions as may to him seem wise, after such person shall have served the minimum term of imprisonment provided by law for his offense: § 1, chapter 187, *supra.* Before the governor is permitted to grant a parole under said act, he is required to procure from the superintendent of the penitentiary a report of the behavior and conduct of the prisoner, and otherwise to satisfy himself that there is a reasonable probability that the prisoner will, if paroled, be and remain a law-abiding citizen: § 2, chapter 187.

Sections 3 and 4 of the act are substantially the same as §§ 13-1907 and 13-1908, respectively, Oregon Code 1930, and will hereinafter be considered in detail.

The 1905 act was amended by chapter 127, Laws 1911, the title of which amending act was as follows:

"To extend and define the indeterminate sentence; to create a parole board and to provide its powers and duties; to repeal Sections 1723 and 1731 of Lord's Oregon Laws, and to amend Sections 1592, 1724, 1725, 1726, 1727, 1728, 1729, and 1730 of Lord's Oregon Laws, all of the foregoing named sections being various parts and sections of Chapter 187, General Laws of Oregon for 1905."

Section 1 of the 1905 act is by the 1911 act amended so that it is made mandatory upon the court, whenever any person is convicted of a crime for which the maximum punishment is a definite term of years in the penitentiary, to sentence such person to imprisonment in the penitentiary without limitation of time, and to state in the judgment of sentence the minimum and maximum penalties provided by law for such crime. Such sentence is designated as "indeterminate": § 7, chapter 172, *supra*.

Section 8 of the 1911 act provides that the governor may, upon his own motion or upon recommendation of the parole board, at any time after a prisoner has served the minimum term of imprisonment prescribed by law, parole such prisoner upon such terms and conditions as may seem to the governor just or expedient. It is further provided by the 1911 enactment that in no event shall a person be paroled under that act unless such person has served the minimum penitentiary sentence prescribed by law for the crime of which he. or she was convicted, and that no person shall serve a longer term of imprisonment than the maximum sentence prescribed by law.

In 1917, by chapter 302, Laws 1917, the legislature further amended certain provisions of the 1905 act as

amended in 1911. By section 7 of the 1917 act it is provided that except for the crimes of murder and treason the minimum period of imprisonment in the penitentiary theretofore provided by law for the punishment of felonies is abolished, and that except for the crimes of murder and treason the court shall impose a sentence of "imprisonment in the penitentiary without limitation of time, stating in such judgment and sentence, both the minimum penitentiary penalty, which shall be fixed by said court and shall not exceed one-half the maximum term of imprisonment established by law, and also the maximum penitentiary penalty for such crime, which shall not exceed the maximum term of imprisonment provided by law."

Section 8 of chapter 302, *supra,* provides for the parole of a prisoner upon the recommendation of the parole board, at any time after the prisoner has served the minimum term in the penitentiary fixed by the judgment of the court. Section 16 of this act is almost identical with § 16 of the 1911 enactment, except that the phrase "minimum penitentiary sentence prescribed by law" in the 1911 act is changed to read, "the minimum penitentiary sentence fixed and ordered by the court".

The legislature in 1919 further amended the indeterminate sentence law so as to provide that the judgment and sentence should merely state the maximum penitentiary penalty imposed by the court, eliminating the provision as to minimum sentence contained in the then-existing law and providing that the maximum term imposed by the court should not exceed the maximum term of imprisonment provided by law: § 1, chapter 150, Laws 1919. In the 1919 amendment we see introduced for the first time reference to allowance for good behavior, in a provision for computation of time similar

to that contained in § 13-1906, *supra,* except that the 1919 amendment provides that the deduction be computed for each month of *one-fourth* the maximum sentence, instead of each month of *one-half* the maximum sentence.

At the same session, the legislature enacted chapter 149, Laws 1919, now codified as § 13-1905, Oregon Code 1930, and hereinafter to be considered in detail.

Further amendment of the 1905 act as subsequently amended was effected by the legislature at the special session of 1920 (chapter 8, Laws Special Session 1920), by removing from the operation of the provision for indeterminate sentence, in addition to murder and treason, crimes of homicide in any degree, rape where violence is an element of the crime, robbery of any kind, burglary when armed with a dangerous weapon, and assault with intent to kill while being armed with a dangerous weapon. The 1920 amendment further provided that as to crimes so removed from the operation of the indeterminate sentence law, except where the penalty by law is life imprisonment, the court should fix a definite term to be served in the penitentiary, not exceeding the maximum term provided by law for such offense. After the foregoing specifications there is then added for the first time this clause: "Persons sentenced to serve such definite terms shall be entitled to the good-time deductions for good behavior and general reformation *provided for in this act*" [italics supplied].

Section 2 of chapter 8, *supra,* is similar to § 13-1906, *supra,* with the exception that its provision as to record of good conduct is based upon "five days for each month of said one-half of the maximum sentence" and contains no differentiation between instances in which the maximum sentence is one year or less and those

in which it is for a period of more than a year, as provided in § 13-1906, *supra*.

No further amendments, so far as the question now before us is concerned, were made to the indeterminate sentence and parole law, with the exception of that made in 1921 to what is now § 13-1906, *supra*, which has already been noted.

Let us now direct attention to a more detailed consideration of the sections of the code applicable to the question under discussion, all of which sections are, with the exception of § 13-1905, *supra*, amendments of sections which were originally parts of chapter 187, Laws 1905. The interpretation of § 13-1906 is of utmost importance. The second paragraph of that section provides that the governor may, upon his own motion or upon the recommendation of the parole board, parole any person under the age of 20 years at the time of conviction and sentence, at any time after he has been committed to the penitentiary, and therefore it is not important in this discussion. That section, with the said paragraph omitted, reads as follows:

"Any person sentenced to serve an indeterminate sentence in the penitentiary may be paroled by the governor upon his own motion, or upon the recommendation of the parole board, in accordance with the provisions of this section set forth, to wit:

&ast; &ast; &ast; &ast; &ast;

"Any person over the age of twenty years at the time of conviction and sentence who has not been previously convicted of a crime may be paroled by the governor upon his own motion, or upon recommendation of the parole board, at any time after such person has served one-half of the maximum term for which such person has been sentenced; provided, however, that a record of good conduct, industry and evidence of general reformation certified to by the warden of

the penitentiary shall entitle such person to a deduction of five days for each month of said one-half of the maximum sentence, when said one-half of maximum sentence is one year or less, and a deduction of ten days for each month of such period beyond one year. The effect of this 'good time' deduction is intended to be as follows: When the one-half period of the maximum sentence is six months, a parole may be granted when five months have been served; when the one-half period is twelve months a parole may be granted when ten months have been served; when the one-half period is eighteen months, a parole may be granted when twelve months have been served; when the one-half period is two years a parole may be granted when sixteen months have been served, and so on proportionately for any term.''

It will be observed that the first paragraph of this section provides that the governor may parole any person sentenced for an indeterminate period, ''in accordance with the provisions of this section set forth'', with conditions mentioned upon which the parole may be granted. The conditions upon which such parole may be granted are set forth in the last paragraph above quoted, to the effect that the governor may, upon his own motion, or upon the recommendation of the parole board, parole a prisoner at any time after he ''has served *one-half of the maximum term* for which such person has been sentenced'' [italics supplied]. Following that is the statement relied upon by Fehl, around which this controversy is centered, reading thus: ''provided, however, that a record of good conduct, industry and evidence of general reformation certified to by the warden of the penitentiary shall entitle such person to a deduction of *five days for each month of said one-half of the maximum sentence,* when said one-half of maximum sentence is one

year or less, and a deduction of 10 days for each month of such period beyond one year" [italics supplied].

Fehl attempts to lift the above proviso bodily from its context and construe it without reference to what precedes or follows it, and in order to arrive at the computation of a credit of 16 months on a term not exceeding four years he computes his deduction at the rate of 10 days for each month of the *maximum* sentence, thereby arriving at the conclusion that he is entitled to 480 days' deduction from a maximum sentence of four years. He thus would ignore the plain language of the statute that the deduction from a maximum term of over one year shall be at the rate of 10 days for each month of *said one-half* of the maximum sentence. We can not, however, by any rule of statutory construction which has been recognized by the courts, interpret this proviso without considering what precedes it and the explanation of its meaning which follows.

The legislature in the enactment of this section was attempting to provide when and under what conditions paroles might be granted by the governor. After specifying that the governor might, upon his own motion or the recommendation of the parole board, grant a parole to any person sentenced for an indeterminate period, after such person had served one-half of the maximum term for which he was sentenced, the proviso is attached to the effect that for good behavior, record of which is to be certified by the warden of the penitentiary, the governor might grant a parole prior to the prisoner's serving one-half the maximum sentence. That this is what was intended by the legislature is apparent from what immediately follows the proviso, to wit:

"The *effect* of this *'good time' deduction* is intended to be as follows: When the *one-half period* of the *maximum sentence* is six months, a parole may be granted when five months have been served; when the *one-half period* is twelve months, a parole may be granted when ten months have been served; when the *one-half period* is eighteen months, a parole may be granted when twelve months have been served; when the *one-half period* is two years, a parole may be granted when sixteen months have been served, and so on proportionately for any term" [italics supplied].

In *Olson v. Heisen*, 90 Or. 176, 178 (175 P. 859), with reference to the different parts of a legislative act, this court said:

"When we speak of the purview of a statute we mean the enacting part or body of the act as distinguished from other parts of it, such as the preamble, the title, saving clauses and provisos:" citing authorities.

"The appropriate function of a proviso is to restrain or modify the purview of the statute in which the proviso is found:" citing authorities.

This statement is found in 2 Lewis' Sutherland on Statutory Construction, (2d Ed.) 670, § 351:

"Provisos and exceptions are similar; intended to restrain the enacting clause; to except something which would otherwise be within it, or in some manner to modify it. A proviso is something engrafted upon a preceding enactment, and is legitimately used for the purpose of taking special cases out of a general class, or to guard against misinterpretation. * * * A proviso is so identified with the text of a statute which it qualifies that if such enacting part is repealed by a subsequent statute repugnant to it, the proviso will fall also."

The proviso in the section of the code under consideration merely modifies what precedes it and does not inject into it anything foreign to the purview or enacting clause of the section. If the enacting clause, pro-

viding the conditions under which paroles may be granted, were to be repealed by a subsequent act repugnant to it, the proviso would also be repealed.

Section 13-1909, Oregon Code 1930, provides that "the superintendent of the penitentiary wherein said prisoner is confined shall, at least every month, make full report to the parole board concerning all prisoners who are eligible or are about to become eligible to parole". Section 13-1907, *supra*, is as follows:

"In granting any parole to any person under indeterminate sentence, the governor shall not hear or entertain any petition or any argument of attorneys for the parole of such prisoner, but he shall consider the prisoner's general demeanor and record for good conduct at the penitentiary, and such findings and recommendations in the case as may be made by the parole board. This shall not, however, preclude the governor from obtaining other information in regard to said prisoner and in regard to the circumstances likely to surround him if paroled, or from considering any recommendation in regard thereto, made by the court in which said prisoner was convicted."

Section 13-1908, Oregon Code 1930, reads thus:

"A parole of any prisoner shall be certified by the governor to the superintendent of the penitentiary wherein the prisoner was confined, and said prisoner shall thereupon be discharged on parole, and the governor may, in his discretion, upon the final discharge of said prisoner, restore him to all the rights and privileges of citizenship. Said superintendent shall keep a record of all such paroles and discharges."

The three last quoted sections of the code provide the procedure to be followed in regard to reports to be made concerning prisoners confined in the penitentiary, what is to be done by the governor in considering applications for parole, and the certification to be made by him when the prisoner has been paroled. By § 13-1907,

*supra,* the governor is not limited to the findings and recommendations of the parole board, but is given authority to obtain other information in regard to the prisoner and "in regard to the circumstances likely to surround him if paroled".

When the proviso regarding "good time" was added to what is now § 13-1906, *supra,* there was in the federal statutes what is now 18 U. S. C. A., § 710, which expressly provides that a prisoner "whose record of conduct shows that he has faithfully observed all the rules and has not been subjected to punishment, shall be entitled to a deduction from the term of his sentence", to be estimated as thereinafter provided.

Several of the states, at the time of the amendment of our law in 1919 providing for deduction for good time, had statutes similar to the federal law. Such statutes either provided for a deduction from, or credit on, the time of sentence to be served. Many decisions at that time had been reported, construing said statutes: *Chattahoochee Brick Company v. Goings,* 135 Ga. 529 (69 S. E. 865; Ann. Cas. 1912A, 263); *Ex parte Darling,* 16 Nev. 98 (40 Am. Rep. 495); *Stephens v. Conley,* 48 Mont. 352 (138 P. 189; Ann. Cas. 1915D, 958); *In re Blocker,* 69 Colo. 259 (193 P. 546); *In re Kness,* 58 Kans. 705 (50 P. 939). A number of other cases also could be cited, construing statutes providing for reduction in sentence for good behavior. In all the decisions on this subject which have come to our attention wherein the courts have held that the prisoner was entitled as a matter of right to a deduction from the term of sentence for good behavior, the controlling statutes have expressly provided that there should be a deduction of certain time from the sentence.

Had the Oregon legislature at the time of the amendment in 1919 relating to good conduct intended to give

to prisoners confined in the penitentiary a deduction from sentence because of good conduct, it seems reasonable to assume that it would have used the language employed by other states to effect that purpose, and would not have incorporated the measure in the proviso of a parole statute, the enabling clause of which defines the terms and conditions under which a parole may be granted.

In support of Fehl's contention that our statute grants to him a deduction from his maximum term for good conduct, *In re Kness,* supra, is cited and quoted extensively. A part of the statute there involved, as quoted from the decision, is as follows: "Every convict whose name does not appear upon such record of reports for violation of the prison rules *shall be entitled to a deduction from his sentence* of three days per month for the first year or fraction of a year \* \* \*" [italics supplied].

Section 13-1905, *supra,* has been referred to and quoted as showing an intention on the part of the legislature to grant to prisoners under determinate and indeterminate sentences deduction from their time of sentence, for good conduct. This act was passed in 1919 (chapter 149, Laws 1919), with entire title reading thus: "Extending the power of the governor to grant paroles in certain cases." The act as originally passed and as codified in § 13-1905, reads as follows:

"All persons heretofore convicted of felonies and sentenced to the penitentiary for a definite term of years may be allowed deductions from their term of service in said penitentiary in the same manner and with like effect as in the case of persons who have received an indeterminate sentence, and may be paroled by the governor on his own motion or upon recommendation of the parole board, whenever the certificate of the warden of the penitentiary shall show that the

prison records of such persons entitle them to be considered for parole.''

The original act referred to persons theretofore convicted, and in 1933 (chapter 44, Oregon Laws 1933), it was amended by adding after the word ''heretofore'' the words ''or hereafter'', so as to apply to sentences imposed in the future. It is apparent from the title of the act that the legislature did not intend to grant to those sentenced for a definite term in the penitentiary the right to a deduction from time to be served, for good behavior. The title of the act does not cover that subject, and the presumption is that the act is constitutional and the enacting clause must, if possible, be so interpreted as to come within the title of the act.

When an act is susceptible of two interpretations, one of which would render the act constitutional, and the other unconstitutional, that interpretation which would give effect to the act as constitutional must be adopted. Were said § 13-1905 to be construed to reduce the term of sentence of those prisoners committed to the penitentiary for a determinate period, it would be necessary to hold the entire act unconstitutional, since that subject is not expressed in the title of the act, nor can it be inferred therefrom, and the entire act is so constructed that it can not be dismembered and held constitutional in part and unconstitutional in part.

The last-mentioned statute, § 13-1905, *supra,* has been brought into this discussion as lending support to the theory that the legislature intended by the proviso included in § 13-1906, *supra,* to grant to a prisoner confined in the penitentiary, as a matter of right, for good behavior, a certain deduction of time from the maximum sentence imposed upon him. In other words, it has been suggested as a legislative construction of

what was meant by the language used in the proviso of § 13-1906, *supra*. If § 13-1905, *supra*, aids us in any way at all, it is by demonstrating that the proviso mentioned is limited to paroles. Even the title of § 13-1905 restricts the act itself to paroles and does not cover the release of prisoners prior to termination of sentence except by parole. There is nothing contained in the enacting clause of the statute now codified as § 13-1905 which purports to grant to the prisoner as a matter of right a reduction of time to be served, for good behavior.

The title of the original parole law enacted in 1905 and the subsequent title of the amendment to that act in 1911, both of which have been fully discussed, are not sufficiently broad or comprehensive to cover the object asserted by defendant to have been intended, *i. e.*, that the proviso of § 13-1906, *supra*, should effect automatically a shortening of the term of sentence imposed by the court, based upon good conduct of the prisoner. One reading that title would expect the act to mention matters concerning conditional release of prisoners by the governor, and would not have in mind the final termination of prison sentences by any other means than parole. It can not be said that because the title of the act refers to a release of prisoners, although specified as parole, every manner of release from prison was contemplated by the legislature. In other words, courts can not ignore, when interpreting the statute, the limitation placed thereon by the legislature through the words used by it in the title of the act.

In *State v. Perry*, 77 Or. 453 (151 P. 655), involving chapter 151, Laws 1913, attempt was made to enlarge the meaning of the act beyond the scope of the title, which read as follows: "An act to prevent the barter, sale, trading, giving or furnishing of intoxi-

cating liquors * * * to any convict or prisoner in the Oregon state penitentiary. * * *'' The enacting clause imposed a penalty upon the giving, selling, furnishing or aiding in selling, giving or furnishing of intoxicating liquor to any person sentenced to serve a term in the state penitentiary. The defendant was indicted for and convicted of furnishing intoxicating liquor to a convict sentenced to serve a term in the state penitentiary, who had not yet been received at that institution. The contention of the attorney for the state was expressed by the court in the opinion therein, and commented upon, as follows:

"Counsel for the state earnestly contend that this act reaches every convict sentenced to confinement in the penitentiary, whether in or out of that institution, and that the general subject mentioned in the title of furnishing liquor to a convict is sufficient to uphold the act; but we can not agree with this. The title contains the words, 'to prevent the furnishing of liquor to any convict or prisoner *in* the penitentiary,' and nowhere in the title is this subject enlarged, confining the legislation to convicts in the prison. No one on reading this title would dream that it was intended to or did go beyond those so confined."

The court in that case in discussing the purpose of § 20, article IV, of the state constitution, which provides that every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title, referred to and quoted from two Oregon cases, as follows:

"Mr. Justice Wolverton, in Clemmensen v. Peterson, 35 Or. 47 (56 P. 1015), says: This provision 'was designed by the framers of the constitution that in every case the proposed measure should stand upon its own merits, and that the legislature should be fairly satisfied of its purpose by an inspection of the title,

when required to pass upon it, so as not to be surprised or misled by the subject which the title purported to express.'

"Spaulding Logging Co. v. Independence Imp. Co., 42 Or. 394 (71 P. 132), holds: 'The intention of the constitution plainly is that the subject of the proposed legislation shall be stated in the title, so that the members of the legislature and the public may thereby be informed of the subject on which the former are invited to vote and legislate, without the necessity of studying the entire bill; and the courts can not reject as surplusage any material part of the title in order to make it conform to some other or different legislation.' "

It may be said that the legislature in enacting laws affecting prisoners within the penitentiary must necessarily have in mind those who have already been convicted and committed to the penitentiary but have not yet been received there, just as well as that the legislature in considering indeterminate sentences must also have in mind determinate sentences, or in legislating as to paroles must intend to include final discharge. But in any case the mere mention of one subject in the title of the act would not include another as necessarily inferred. In the language of the court in *State v. Perry,* supra, " No one on reading this title [here, one relating to paroles] would dream that it was intended to or did go beyond" prisoners under consideration for parole purposes.

Section 20 of article IV of the Oregon constitution is identical with § 19, article IV, constitution of Indiana, and it is generally believed that our article IV was adopted from the Indiana organic act. In construing § 19, article IV, of the latter constitution, the Indiana supreme court in *Crabbs v. State,* 193 Ind. 248 (139 N. E. 180), said: "Under this clause of the constitution the title becomes an indispensable part of every act."

The opinion then quoted from Sutherland on Statutory Construction in part as follows: "The title can not be enlarged by construction when too narrow to cover all the provisions in the enacting part, nor can the purview be contracted by construction to fit the title." Continuing, the court quoted with approval from Cooley on Constitutional Limitation, (6th Ed.) 178, as follows:

"As the legislature may make the title to an act as restrictive as they please, it is obvious that they may sometimes so frame it as to preclude many matters being included in the act which might with entire propriety have been embraced in one enactment with the matters indicated by the title, but which must now be excluded because the title has been made unnecessarily restrictive. The courts can not enlarge the scope of the title. They are vested with no dispensing power. The constitution has made the title the conclusive index to the legislative intent as to what shall have operation. It is no answer to say that the title might have been made more comprehensive, if in fact the legislature have not seen fit to make it so."

If the question were properly before us of including in the same statute provisions both for granting paroles and for reducing sentences for good behavior, we should be constrained to hold that such a statute would not be violative of article IV, § 20, *supra*, as containing more than one subject and matters therewith properly connected. The entire title of the Oregon code of criminal procedure adopted in 1864 was: "An act to provide a code of criminal procedure and define crimes and their punishment." Surely the methods of release from the penitentiary by parole and by other termination of sentence are as closely related as are the matters contained in the 1864 code of criminal procedure. However, that question is not here for determination, for the

reason that the title under consideration is restricted to paroles and we are not at liberty to enlarge its scope.

The plaintiff asserts that the contention now advanced by him, *i. e.*, that he had with good time allowance fully served the maximum sentence imposed upon him, on April 15, 1936, two years and eight months after he began serving, is strengthened by the construction placed upon the statute in question by the prison officials. In this connection he alleges:

"That on August 15, 1933, and for more than 14 years prior thereto, there was in full force and effect at said penitentiary certain rules and regulations printed and published in a booklet under the seal of the state of Oregon entitled 'General Rules for the Inmates of the Oregon State Penitentiary. J. W. Lewis, Warden, E. C. Halley, Deputy Warden,' and on August 15, 1933, plaintiff was given a booklet of said rules and regulations by the warden of said penitentiary, which booklet contained the following statement, to-wit:

" 'Length of sentences with credits showing actual time to serve in connection with various sentences from one year to ten years, after allowing good time, which is allowed for good behavior.

| Sentence | Minimum With Credits | Maximum With Credits |
|---|---|---|
| 1 year | 5 mos. | 10 mos. |
| 2 years | 10 mos. | 16 mos. |
| 3 years | 1 year | 2 years |
| 4 years | 1 yr. 4mo. | 2 yrs. 8 mo. |
| 5 years | 1 yr. 8 mo. | 3 yrs. 4 mo. |
| 6 years | 2 years | 4 years |
| 7 years | 2 yrs. 4 mo. | 4 yrs. 8. mo. |
| 8 years | 2 yrs. 8 mo. | 5 yrs. 4 mo. |
| 9 years | 3 years | 6 years |
| 10 years | 3 yrs. 4 mo. | 6 yrs. 8 mo. |

The above quoted excerpt would indicate that the construction contended for by plaintiff was first placed upon the act by warden Lewis and his deputy, Halley. Mr. J. W. Lewis first became warden of the penitentiary in 1922, at which time E. C. Halley became deputy warden. Mr. Lewis served until January, 1923, and his deputy until February of the same year. Mr. Lewis and Mr. Halley again became warden and deputy warden, respectively, in April, 1927. Of these facts we take judicial knowledge: *Butts v. Purdy,* 63 Or. 150 (125 P. 313; 127 P. 25); *State v. Lee Chue,* 130 Or. 99 (279 P. 285). Therefore, any construction which these officials may have placed upon the law relating to paroles and final discharge of prisoners could not have been effective until at least May, 1922, rather than "more than fourteen years prior to August 15, 1933". Moreover, any construction which was given the law affecting final discharge, "more than fourteen years prior to August 15, 1933," would have antedated the amendments of 1920 and 1921 and would have had effect under a statute essentially different as to computation of time for good behavior from the present law.

It is further alleged that the procedure referred to in the paragraph of the complaint above quoted was continued until April 15, 1936, at which time, it is asserted, plaintiff was entitled to release from the penitentiary. Yet it is alleged that at the time of the filing of the complaint herein, to wit, June 15, 1936, "over a hundred prisoners are held within said penitentiary who under the rules and law hereinbefore alleged, and under the interpretation thereof and practice thereunder, for over fourteen (14) years, would have been released by the warden." It is apparent from the matters just alluded to that the construction placed upon the act under consideration could not have been of

more than fourteen years' duration at the time when plaintiff was received at the prison. We are therefore left without definite data as to when such construction of the act was first given effect, if at all.

Reverting now to the minimum and maximum sentences set forth in the allegations of the complaint above quoted, we notice that opposite the sentence of four years is a minimum, with credit, of one year and four months, and the maximum, with credit, is designated as two years and eight months. There can be no contention that the warden and his deputy have a right, under any statute that has been called to our attention, without the action of the chief executive, to discharge a prisoner serving a determinate or indeterminate sentence of four years, when the prisoner has served only one year and four months. Likewise, there is no provision in the law permitting the warden and his deputy, or either of them, to release a prisoner under a four years' sentence, after he has served but two years and eight months thereof, regardless of how exemplary his conduct has been. Even if the full effect contended for by plaintiff could be given to the proviso § 13-1906, *supra,* we could not construe the language which allows ten days' deduction for each month of *one-half the maximum sentence* to mean ten days for each month of *both* halves of such sentence.

It is undoubtedly true that when an act is susceptible of two interpretations both of which would be constitutional, the court in construing it will give some weight to the interpretation which has been followed for a long period of time by the department charged with administration of the act. It is axiomatic, however, that the court will not give weight to that interpretation of an act by a department which would render it

unconstitutional, if the act is equally susceptible of an interpretation which would render it constitutional.

In *State Board of Administration v. Jones,* 212 Ala. 380 (102 So. 626), it was contended by the prisoner that he was entitled as of right to a certain reduction of sentence based upon good conduct. He predicated the right upon the wording of the statute and the departmental construction placed upon the act. In holding adversely to the prisoner, the court said:

"Moreover, departmental construction of statutes, however long continued, is not controlling, but merely an aid to courts in cases otherwise doubtful. 'Contemporary construction, and official usage [for 70 years there] are among the legitimate aids in the interpretation of statutes.' Wetmore v. State, 55 Ala. 198; and, 'where the meaning of such laws is doubtful, official and popular interpretation, as exemplified in practice for a number of years, may be given some weight as a factor in their judicial construction.' Shepherd v. Sartain, 185 Ala. 439, 456, 64 So. 57, 64. So where the language of the statute is reasonably plain in its meaning, such interpretation and practice will not be accorded the effect of an amendment or repeal, and the legislative intent will be nevertheless declared and enforced as expressed."

The conclusion is inevitable, from what has been said, that § 13-1906 in its entirety refers exclusively to the issuance of paroles by the governor and does not have any bearing upon the shortening of the term of a prisoner's sentence otherwise than by parole. The statute does not provide for the early release of a prisoner except through action of the governor in granting a parole.

The legislative history of the indeterminate sentence law indicates an intention on the part of the legislature to aid and assist the prisoner who is not a

hardened and habitual criminal, to make him subject to parole at the earliest possible time and to assist him while under parole. It must be assumed that the prison officials, the parole board and the chief executive of the state have not acted and will not act arbitrarily or capriciously in such matters, and that they will carry out the spirit of our parole law.

In the instant case the governor has issued a conditional parole to Fehl, which has by him been accepted. Under the law as here interpreted Fehl is not entitled to his freedom as a matter of right until he has served the sentence of not exceeding four years imposed upon him by the trial court.

There is not involved in this appeal the question of whether the parole statute is in contravention of § 14, article V of the Oregon constitution, which confers upon the governor exclusive authority to grant reprieves, commutations and pardons.

For the reasons hereinabove expressed, the decree appealed from should be affirmed.

———

KELLY, J. (dissenting). Dante placed on the gate to inferno the motto "Abandon hope all ye who enter here." Without parole and good conduct statutes, much of the despair of that motto must attend a prisoner upon entering the penitentiary. These statutes, that is, indeterminate sentence, parole and good conduct statutes, substitute for that feeling of hopelessness, on the part of such prisoners, the encouragement reflected in the expression, "Virtue hath its reward, even here."

The writer sickens at the thought that this hope, this inspiration toward reform and good citizenship, after seventeen years of its realization and effective-

ness on the part of the administrative officers, should be shattered and rendered nugatory by a court, the members of which are unable to agree upon the reason why it is to be thus destroyed.

Aside from this somewhat sentimental attitude, the writer thinks that there are four reasons why plaintiff's position should be upheld.

First. It is consonant with practical, substantial, man to man justice. When the plaintiff entered the penitentiary the rules of the prison, which were then placed in his hands, told him that good conduct on his part would reduce the maximum of his sentence as he is now asking the court to say that it should be reduced. He conformed to those rules, he was a model prisoner, and he did just that which in other cases secured such reduction and final release because of it. In the view of the writer, withholding a final release from the plaintiff, under these circumstances, results in injustice. In saying this, it is not meant that the writer's associates are in any degree less anxious that justice be done than the writer. The writer thinks that the principles of statutory construction and constitutional limitations justify plaintiff's position. Except Mr. Justice BELT, those of the writer's associates, who heard this case, do not think so. It is because of this difference of opinion that the writer feels warranted in expressing his dissent and not in any sense for want of respect for the distinguished jurist, who wrote the prevailing opinion, or for the other members of the court who concur therein.

Second. The writer thinks that a consideration of four sections of the Oregon Code 1930, being sections 13-1905, 13-1906, 13-1129 and 13-1916 require the construction of the good conduct provision of section 13-1906 to be mandatory in such a case as the one at bar,

where no question of parole is involved, but, where the prisoner has served such a length of time that when the time of service is considered in connection with the good conduct credit to which, if the statute applies to cases of final release, the prisoner is entitled, the two terms, that is, the term of actual service and the term allowed for good conduct equal the full term of his maximum sentence.

One of these four sections is section 13-1906, Oregon Code 1930, which employs the word, may, with respect to paroles, but uses the word, shall, in reference to deductions for good conduct, etc. The writer thinks that the use of the word, shall, implies that under some state of the record the deduction for good conduct is mandatory. Not being mandatory, with respect to a parole, which is a conditional release, the writer thinks that it is reasonable to conclude that it is mandatory with respect to an unconditional release or final discharge.

The other three sections, which in the writer's view support plaintiff's right to an unconditional final release are section 13-1905, which, until 1933, provided for paroles for those sentenced to determinate sentences prior to 1919, and did not provide for a parole for prisoners sentenced to definite terms subsequent to 1919; section 13-1129, which provides that prisoners, sentenced to determinate terms, shall be entitled to deductions for good conduct, etc., and section 13-1916, which provides that parole violators shall be entitled to deductions for good time, etc.

The writer thinks that it is clearly manifest that in cases of those sentenced to determinate sentences subsequent to 1919 and prior to 1933, the only purpose for which good conduct credit could be allowed would be to reduce the term of actual incarceration required before

a final release or discharge would be given. The 1933 amendment, which provided for paroles for such prisoners, is in the writer's view a legislative construction of the prior statutes to the effect that no parole had theretofore been available for them.

From a common sense viewpoint, the advisory effect upon the parole board of a credit for good conduct, on the part of a parole violator after his return to the prison, would be so infinitesimal as to be practically nil.

The writer thinks that the mandatory word, shall, employed in section 13-1916, has reference to an allowance which affects a shortening of the maximum for such parole violator's sentence.

In the clause of section 13-1906, referring to the allowance of deduction for good conduct, etc., those sentenced to indeterminate sentences to which plaintiff belongs, the language is mandatory. It reads:

"* * * a record of good conduct, industry and evidence of general reformation certified to by the warden of the penitentiary shall entitle such person to a deduction," etc.

In the opinion of the writer, this mandatory language should not be disregarded, neither should it be given effect to compel the issuance of a parole, because, as to that, the language is permissive.

The writer concludes that it is consonant with logic, justice and approved principles of statutory construction to give mandatory effect to the word, shall, in section 13-1906 so that the maximum of the sentence of one serving under an indeterminate sentence, as well as those serving under determinate sentences, shall be lessened by credits for good conduct, and, when so lessened, a final release should be given.

In the case at bar, the plaintiff does not seek a parole. He seeks to annul the purported parole granted to him. The question here presented is whether he should have been finally discharged as a prisoner who had fully served his term.

Despite the mandatory language of the statute, that those sentenced indeterminately shall be entitled to deduction for good conduct, etc., the writer thinks that this does not confer a vested right. It is inchoate and defeasible until the time actually served added to the time earned by good conduct attested by the certificate of the warden equals the full maximum term of the sentence.

As said by United States Circuit Judge Sibley:

"The credit is not a vested right, but only contingent until a time arrives such that its allowance will end imprisonment. The prisoner's record of conduct which is carefully kept under rules of the penitentiary is then to be inspected, and, if found such as the statute prescribes, the prisoner is entitled to the credit and to discharge, and has often been granted it on habeas corpus." *Aderhold, Warden, v. Perry,* 59 F. (2d) 379, 380.

The third reason in support of the writer's view is that,—

"The tendency of courts seems to be, if possible, to construe good conduct statutes as entitling the prisoner to the benefits of the statute as a matter of right and not as a favor." 21 R. C. L. Subject: Prisons and Prisoners, p. 1192, Art. VIII, par. 29 citing *Murphy v. Com.,* 172 Mass. 264 (52 N. E. 505, 70 A. S. R. 266, 43 L. R. A. 154, note of 34 L. R. A. 511).

"Good conduct statutes are framed with the intention of improving prison discipline and have that effect if their enforcement is allowed." Ibid Par. 28.

The fourth reason is that for nearly seventeen years the administrative authorities, having the duty to ad-

minister these statutes, have construed them in accordance with the views of the writer in respect to the issuance of final releases or discharges.

The question of the propriety or impropriety of granting a parole is not in this case; but the writer ventures to say that, in his opinion, the language of the statute in that respect is not mandatory and he is unwilling to be influenced by administrative construction to the contrary.

It appears from the complaint that the rules and regulations of the penitentiary, which have been in effect since 1919, show, among other things, that the length of a maximum sentence of four years, after allowing good time, which is allowed for good behavior, is two years and eight months. This discloses that for more than seventeen years the contemporaneous construction placed upon the statute in question by the officers charged with the duty of executing them has been in accord with the construction here given. Such construction, having been observed and acted upon for a long period of time, should not be disregarded or overturned, except for the most cogent reasons and unless it be clear that such construction is erroneous. 59 C. J., Subject: Statutes, p. 1025, et seq. § 609, note 48 and authorities there cited, among which is *Spencer v. Portland*, 114 Or. 381 (235 P. 279), wherein numerous authorities sustaining the rule are collated. This rule is also recognized in *Kelsey v. Norblad*, 136 Or. 76, 79 (298 P. 199).

The prevailing opinion holds that if the acts under consideration are to be given the effect of shortening the time of a sentence and also authorizing the governor of the state to parole a prisoner, such acts contain two subjects of legislation and not one subject and matters properly connected therewith and hence, if given

such construction, are in violation of section 20 of article IV of the constitution.

The specially concurring opinion holds that the titles referring to paroles, indeterminate sentences, creating a parole board, defining its duties and extending the power of the governor to grant paroles embrace only one subject, namely, that of paroles and that deduction for good conduct, on the part of prisoner whether sentenced to a determinate or, as in the case at bar, to an indeterminate sentence, is a subject wholly foreign to those titles and hence, to construe them as the writer does, is to render them unconstitutional.

The view of the writer is that taking the titles together they deal with but one general subject, namely, the manner of carrying into effect the punishment provided by law of persons convicted of certain offenses.

In Illinois, the parole act of 1908 was construed by the supreme court of that state. The act was entitled:

"An act to revise the law in relation to the sentence and commitment of persons convicted of crime, and providing for a system of parole, and to provide compensation for the officers of said system of parole."

The titles of the Oregon acts under consideration here, namely, the act of 1905 and the act of 1911, "provide for sentencing certain persons convicted of felonies to imprisonment for indeterminate periods;" (General Laws of Oregon 1905, ch. 187, p. 318) "to extend and define the indeterminate sentence; to create a parole board and provide its powers and duties." (General Laws of Oregon 1911, ch. 127, p. 172.)

With reference to the title of the Illinois act, the Illinois court, in the prevailing opinion, say:

"The general subject dealt with by the act is the manner of carrying into effect the punishment, pro-

vided by law, of persons convicted of certain offenses. All of its provisions relate to that subject and are reasonably connected therewith." *People v. Joyce,* 246 Ill. 124 (92 N. E. 607, 20 Ann. Cas. 472).

The writer thinks that a deduction from the term of actual incarceration is inseparably connected with the subject of eligibility for parole. In his opinion, instead of good conduct deduction being foreign to and dissociated from parole, it is part of the warp and woof of the principle upon which all paroles after commitment are considered or granted. The writer thinks that in this state, where both determinate and indeterminate sentences are imposed, it is impossible to think of the class of offenders upon whom indeterminate sentences must be imposed without thinking of the class to which determinate sentences apply. So, too, is it impossible for the writer to think of the terms and conditions rendering prisoners eligible for conditional release without thinking of those who have only an unconditional release for their objective.

As the writer views it, all these matters are inseparably connected with the manner of carrying into effect the punishment of felons provided by law.

The trial courts of this state have observed the provision requiring determinate sentences; and scores, if not hundreds, of offenders have thus been sentenced since the act of 1920. Until the present case was heard, no one has ventured to suggest that such provision is unconstitutional. The writer thinks, therefore, that it has been judicially approved by conformity thereto during such a long period of time.

The title of chapter 149 of the General Laws of 1919 is "An act extending the power of the governor to grant paroles in certain cases." The act provides that all persons theretofore sentenced for a definite term of

years may be allowed deductions from their term of service in the same manner and with like effect as in the case of persons who have received an indeterminate sentence and may be paroled by the governor whenever the certificate of the warden shall show that their prison records entitle them to be considered for parole.

It is argued that to apply the terms of this act to the subject of a final discharge is to render it unconstitutional, because it is said that the title of the act is restricted only to paroles.

It is true that the term, final discharge, is not mentioned in the title, but certainly it is germane to the phrase,—"extending the power of the governor to grant paroles." It is impossible to conceive of the extension of a power to grant a conditional release, without thinking of the field into which such extension must necessarily be made, and that is the field or sphere of unconditional release or final discharge. Before the enactment of this law, the prisoners affected by it had only one statutory form of release, namely, final discharge.

A parole from prison is a conditional release; while a final discharge therefrom is an unconditional release. It follows therefore that the title of an act providing for paroles by the governor or extending the right of the governor to issue paroles is germane to the subject of the final discharge of prisoners for the reason that such legislation changes the law which formerly provided only for an unconditional release by giving to some of the prisoners the privilege of a conditional release within the discretion of the governor and withholding such privilege from other prisoners. It is impossible to consider the term, conditional release from prison, without considering its counterterm, unconditional release or final discharge therefrom.

In 1869, more than sixty-seven years ago, this court in considering the constitutional provision that the subject of an act shall be expressed in the title, (Article IV, section 20, Constitution of Oregon) stated

"The object of the provision evidently was to prevent matters wholly foreign and disconnected from the subject expressed in the title from being inserted in the body of the act." *Simpson v. Bailey,* 3 Or. 515, 517.

Subsequent cases approve this statement: *McWhirter v. Brainard,* 5 Or. 426; *O'Keefe v. Weber,* 14 Or. 55 (12 P. 74); *Singer Mfg. Co. v. Graham,* 8 Or. 17, 21 (34 Am. Rep. 572); *Lawrey v. Sterling,* 41 Or. 518 (69 P. 460); *State ex rel. v. Richardson,* 48 Or. 309, 318 (85 P. 225, 8 L. R. A. (N. S.) 362).

This court is also committed to the rule that a liberal construction should be given to the constitutional provision under consideration: *State v. Shaw,* 22 Or. 287 (29 P. 1028); *Calder v. Orr,* 105 Or. 223 (209 P. 479); *State v. Putney,* 110 Or. 634, 646 (224 P. 279).

We have also declared that, in order to comply with this constitutional provision, it is not necessary to expressly mention in detail in the title each phase of the subject treated in the body of the act: *Hansen v. Harris,* 145 Or. 487 (28 P. (2d) 649); *Idleman v. State,* 146 Or. 13 (27 P. (2d) 305).

The writer thinks that determinate sentences are not wholly foreign or disconnected from the subject prescribing indeterminate sentences in certain cases, and that the term unconditional release or final discharge is not wholly foreign to or disconnected from the term parole or conditional release when the latter term is employed in connection with extending the privilege of parole or conditional release to some of the prisoners having the privilege only of final discharge or unconditional release.

For these reasons the writer concludes, that with respect to final discharge, the construction which the warden has heretofore given the statutes in question does not violate the provision of the constitution requiring that the subject of the act shall be expressed in the title.

The other argument is that those sentences to serve definite terms are entitled only to deductions ''provided for in this act'' and since there is no express provision, as in the federal statute, declaring that upon the expiration of a sentence for a definite term the prisoner shall be discharged, we must hold that the legislature intended to restrict the deduction thus prescribed to the purpose of a possible parole only.

There is no express provision so limiting the effect of deductions for good time in cases of determinate sentences.

There being an ambiguity and vagueness arising, because the act under consideration, as passed in 1920, on the one hand, did not expressly provide for a discharge of those serving determinate sentences when allowance for good conduct and actual time of service reached the term of the sentence; and, on the other hand, said act did not expressly limit the effect upon determinate sentences to matters of possible parole, we are justified in resorting, as we have and do, to a consideration of legislation on allied subjects, and to executive, legislative and judicial construction.

It would have been easy to have provided for a parole of prisoners sentenced to a definite term subsequent to the enactment of the statute of 1919 (Chapter 149, General Laws 1919, p. 206); but it is very evident that subsequent to 1919, and prior to 1933, the legislature did not deem those so sentenced to be eligible to parole by virtue of legislative enactment under any

circumstances. This makes it plain that during that time the provision for deduction for good conduct on the part of such prisoners could not have had reference to parole.

Whatever the plaintiff herein attempts to do with a so-called proviso, whether to lift it bodily from its context or to construe it in the light of the three other sections on the subject of allowance for good conduct, the very same thing was done about fourteen years before plaintiff was committed to the institution; and, at that time, it was not done by any prisoner, but by the very efficient, faithful and competent authorities charged with the administration of those laws.

The prevailing opinion holds that a parole is a conditional pardon; and, if that is so, the constitutional power of pardoning vested in the governor is not subject to legislative control.

With due respect for his learned associates who thus differ, the writer is unable to concur in either of these statements.

While there are authorities justifying the definition of a parole which the majority of this court now approve, the writer thinks there is a distinction between a parole and a pardon.

In an early case in Pennsylvania, it is said that "a pardon operates directly on the crime and only indirectly on the criminal. He is discharged from further punishment under the operation of a pardon, because the offense is blotted out for which he was consigned to punishment": *Com. ex rel. Johnson v. Halloway,* 42 Pa. 446 (82 Am. Dec. 526). A parole does not have the effect of effacing the offense, it does not restore to citizenship, it merely releases from incarceration.

In Kansas, this distinction has been recognized, in a case holding that the power conferred upon the board

of managers of the State Reformatory by Kansas General Statute 1897, Chap. 134, to grant an absolute release before the expiration of the sentence, in view of good conduct of the prisoner, is not the executive power of pardon not being the power to remit guilt nor to restore to civil rights: *State v. Page*, 60 Kans. 664 (57 P. 514).

The same distinction has been noted by the supreme court of Indiana: *Miller v. State*, 149 Ind. 607 (40 L. R. A. 109, 49 N. E. 894).

The following cases hold that legislative paroles are encroachments upon the pardoning power of the governor: *In re Conditional Discharge of Convicts*, 73 Vt. 414 (51 Atl. 10, 56 L. R. A. 658); *Oliver v. Oliver*, 169 Mass. 592 (48 N. E. 843); *Murphy v. Com.*, 172 Mass. 264 (52 N. E. 505, 43 L. R. A. 154, 70 Am. St. Rep. 266); *Fuuer v. State*, 122 Ala. 32 (26 S. 146, 82 Am. St. Rep. 17, 45 L. R. A. 502); *State v. State Board of Correction*, 16 Utah 478 (52 P. 1090); *People v. Cummings*, 88 Mich. 249 (50 N. W. 310, 14 L. R. A. 285).

The following cases adopt the theory herein stated, namely that statutes vesting the power to parole convicts in persons other than those in whom the constitution vests the exclusive power to pardon are merely regulative of punishment for convicts and hold that such statutes are not unconstitutional as infringements upon the pardoning powers: *People ex rel. Joyce v. Strassheim*, 242 Ill. 359 (90 N. E. 118); *People v. Joyce*, supra; *Miller v. State*, supra; *State v. Page*, supra; *State v. Stephenson*, 69 Kan. 405 (76 P. 905, 105 Am. St. Rep. 171, 2 Ann. Cas. 841); *George v. Lillard*, 106 Ky. 820 (51 S. W. 793); *Wilson v. Com.*, 141 Ky. 341 (132 S. W. 557); *Berry v. Com.*, 141 Ky. 422 (132 S. W. 1030); *Board of Prison Commissioners v. DeMoss*, 157 Ky. 289 (163 S. W. 183); *In re Marlow*, 75 N. J. L. 400

(68 Atl. 171); *People ex rel. Clark v. Warden,* 39 Misc. 113 (78 N. Y. Supp. 907); *People v. Madden,* 120 App. Div. 338 (105 N. Y. Supp. 554); *People ex rel. Bettram v. Flynn,* 55 Misc. 22 (105 N. Y. Supp. 551); *Com. ex. rel. v. McKenty,* 52 Pa. Super Ct. 332; *Woods v. State,* 130 Tenn. 100 (169 S. W. 558, L. R. A. 1915F, 531); *State ex rel. Greene v. Rimmer,* 131 Tenn. 316 (174 S. W. 1134).

Whether the pardoning power of the governor is subject to legislative control depends entirely upon whether we give effect to the clause,—

"Subject to such regulations as may be provided by law." The first sentence of section 14 of Article V of the Oregon Constitution is as follows:

"He" [the governor] "shall have power to grant reprieves, commutations, and pardons, after conviction for all offenses, except treason, subject to such regulations as may be provided by law."

In a case decided in 1907, this court gave a very clear intimation that this clause should be considered and given effect. After quoting the above quoted sentence of said section 14 of Article V, this court said:

"There have been no regulations governing the exercise of the pardoning power provided by law, except the declaration in section 1572, B & C Comp., that reprieves, commutations and pardons may be granted by the Governor upon such conditions and with such restrictions and limitations as he may think proper, which is but a restatement of the law as it exists without legislative action." *Ex parte Houghton,* 49 Or. 232 (89 P. 801, 9 L. R. A. (N. S.) 737, 13 Ann. Cas. 1101).

To the writer, this expression recognizes that there is legislative control to which the power of pardoning, on the part of the executive, is subject.

It must be conceded that the power to regulate does not ordinarily include the power to prohibit; but it is

very clear to the writer that so regulating the matter that only in a certain class of cases shall a conditional release, not rising to the dignity or effect of a pardon, be granted, is not in any sense prohibiting the governor from pardoning.

The federal constitution in its grant to the president of the power to pardon does not limit or restrict that power: *People v. Bowen,* 43 Cal. 439 (13 Am. Rep. 148). Hence, in the writer's view the case of *Ex parte Garland,* 4 Wall. 333 (18 L. Ed. 366), is not in point.

A very interesting discussion of this question is to be found in *Laird v. Sims,* 16 Ariz. 521 (147 P. 738, L. R. A. 1915F, 519). In the annotation thereto the editor of L. R. A. adversely criticises the case. We quote an excerpt of that criticism:

"In the third place, the court seemed to think that it could not sustain the right of the governor to grant pardons without destroying the power of the legislature to establish a parole system. If it entertained this idea (see last paragraph of opinion), it would seem to have been mistaken. It correctly stated that 'with perhaps one or two exceptions the courts of this country have recognized the validity of legislative boards vested with the power and duty of administering parole laws (State ex rel. Kelly v. Wolfer, 119 Minn. 368, 42 L. R. A. (N. S.) 978, 138 N. W. 315, Ann. Cas. 1914A, 1248, 6 R. C. L. 173) and, we think, rightly so.' "

The most exhaustive case, coming to the attention of the writer, on the subject is from Kansas. There effect is given to the restrictive clause in the Kansas constitution granting the pardoning power to the governor: *Jamison v. Flanner,* 116 Kan. 624 (228 P. 82, 35 A. L. R. 973).

The constitution of Kansas grants the pardoning power to the governor under regulations and restric-

tions prescribed by law. The writer ventures to quote two paragraphs from the opinion last cited.

"We have summarized the constitutional provisions of the several states and the changes made therein and the decisions of the courts thereon, for the reason that they demonstrate, more forcibly than anything we could say, (1) the purpose of the pardoning power of a government, (2) that in our country it is a power inherent in the people, who may place its exercise in any department or official of the government, (3) that its proper use is beneficial, its improper use is detrimental and (4) that to avoid its improper use the people may restrict and regulate it by constitutional provision or may by their Constitution provide that it may be restricted and regulated from time to time by the Legislature. And this is what was done in our state."

"We have been prompted to make this summary because of the argument made on behalf of the appellee, and the loose notion which sometimes prevails that the pardoning power is an executive power, to be exercised by the Governor in his discretion, and that no other official or department of the government can interfere with it. But, as has been seen, that is so only when made so by the Constitution."

In an early Indiana case, a provision of the Indiana constitution was construed granting to the governor power to remit fines and forfeitures, "under such regulations as may be prescribed by law." It was there held that the power thus granted could not be exercised in the absence of statutory regulation. While this case was decided in 1857, it has been followed by subsequent decisions. One of these subsequent decisions was rendered in 1911.": *Ryan v. State,* 176 Ind. 281 (95 N. E. 561). Another in 1928, *State v. Shumaker,* 200 Ind. 716 (164 N. E. 408, 63 A. L. R. 218).

The writer ventures to quote from the opinion in the early case:

"As to remissions, the constitution says: 'He shall have power to remit fines and forfeitures, under such

regulations as may be prescribed by law.' This is the whole grant of power as to remissions. Is it an absolute grant of authority to remit; of a power that can be exercised without regulations prescribed?

Would an authority to a mechanic to build a house under such regulations, and pursuant to such plan, as an architect should prescribe, authorize him to build it as he pleased, without waiting for any plan or regulation from the architect?

It is plain, we think, that the power of remission is not granted absolutely to the governor, but only the power of exercising it pursuant to legislative direction." *State v. Dunning,* 9 Ind. 20.

Applying this construction to language almost identical in the Oregon constitution granting to the governor the power to pardon, reprieve and commute, it is obvious that such power is subject to legislative direction.

The writer firmly believes that as above construed the four sections of our code herein discussed are not in whole or in any part unconstitutional; and that when so treated the result entitles plaintiff to the relief he seeks.

For these reasons, the writer dissents.